**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**RANDAL E. STEWART,**

                                        **Petitioner,**

        **vs.**                                                **9:09-CV-712**
                                                                **(MAD/TWD)**

**CARL HUNT,**

                                        **Respondent.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**RANDAL E. STEWART**
Riverside Motel
Room #4
Fultonville, New York 12072
Petitioner _pro se_

**OFFICE OF THE NEW YORK**                **LISA E. FLEISCHMANN, AAG**
**STATE ATTORNEY GENERAL**
New York  Office
120 Broadway
New York, New York 10271
Attorneys for Respondent

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION[1]

        Petitioner Randal E. Stewart, a state prisoner appearing _pro se_, filed a petition for a writ of

_habeas corpus_ pursuant to 28 U.S.C. § 2254, in which he challenges a November 27, 2007

judgment of conviction in Montgomery County Court, convicting him of Course of Sexual

Conduct Against a Child in the Second Degree (New York Penal Law ("Penal Law") §

_____

        [1] To avoid confusion, anytime the Court references a specific page number for an entry on
the docket, it will cite to the page number assigned by the Court's electronic filing system.

130.80(1)(a)).  *See* Dkt. No. 1.  Petitioner was sentenced to serve a determinate prison term of six

years, to be followed by three-years' post-release supervision.  *See id.*

Petitioner's conviction was affirmed by the Appellate Division, Third Department, on

March 5, 2009, *see People v. Stewart*, 60 A.D.3d 1111 (3d Dep't 2009), and the New York State

Court of Appeals denied leave to appeal on May 21, 2009.  *See People v. Stewart*, 12 N.Y.3d 860

(2009).

Petitioner raises the following claims: (1) the evidence presented at trial was legally

insufficient to support his conviction; (2) the verdict was against the weight of the evidence; and

(3) his statutorily-authorized sentence was excessive.  For the reasons that follow, the petition is

denied and dismissed.


## II. BACKGROUND

**A.     The Trial**

### *1. The prosecution's case*

T.[2] and Petitioner married in 1999, and T. grave birth to their daughter, D., in December

of 2001.  *See* Trial Transcript ("Tr.") at 330-32.[3]  Jennifer Cromer and her fiancé, Brandon Wehr,

babysat D. while T. was at work.  *See id.* at 317-18, 335.  Beginning in February of 2006, Ms.

Cromer and Mr. Wehr watched D. regularly, both during the week and on the weekends.  *See*

---

[2] To protect the privacy of the victim, and because the victim here was a minor, the Court
will refer to the victim and to her family members by their first initials.  *See* N.Y. Civ. Rts. Law §
50-b.

[3] The trial transcript and other state-court records have been filed under seal to protect the
privacy of the victim and her family members.

*id.* at 319, 334.  The couple would watch D. until Petitioner picked her up after work.  Petitioner would then watch his daughter until T. finished her shift.  *See id.*

On November 3, 2006, while Ms. Cromer was watching D., they began to talk about a game D. liked to play.  D. called it the "belly bunker" game and explained to Ms. Cromer that she played it with her father.  At trial, D. testified that when she and Petitioner played this game, he would pull down his pants, and that "[t]here was a great big thing."  *See id.* at 304.  Further, D. testified that the thing was "hard" and that, on the "second day" that she played with it, "[i]t got some white stuff on [her] shirt."  *See id.* at 305.  D. testified that the "white stuff" came from Petitioner's "belly bunker."  *See id.*  On direct examination, D. testified that she played the game with Petitioner 160 times, but on cross-examination when asked how often they played the game, she held up her fingers and said that she had played the game with Petitioner more than ten (10) times.  *See id.* at 311.

On October 27, 2006, Petitioner went to Wichita Falls, Texas for an extended period, to train with the Air National Guard.  *See id.* at 336.  On November 3, 2006, while Petitioner was still in Texas, T. learned that she would have to work beyond her shift, so she asked Ms. Cromer if D. could spend the night at Ms. Cromer's home.  *See id.* at 320-21, 337.  That night, D. told Ms. Cromer that she and Petitioner would play the "belly bunker" game.  *See id.* at 304, 321-22.  Upon hearing about the "game," Ms. Cromer contacted T. and told her to come to her house immediately.  *See id.* at 322, 337.  When T. arrived at Ms. Cromer's home, and after D. was put to bed, Ms. Cromer told T. about the "belly bunker" game that Petitioner was playing with D.  *See id.* at 322, 338.

The next morning, T. spoke with D., who confirmed that she was playing the "belly bunker" game with Petitioner.  *See id.* at 338.  Later that day, T. and Ms. Cromer brought D. to

the Montgomery County Sheriff's Department, where investigators interviewed each of them.  *See id.* at 323, 325, 338-39.  Thereafter, Investigator Joseph Kilmartin participated in the execution of a search warrant at the house in which Petitioner, T. and D. lived.  *See id.* at 380.  While investigators found no physical evidence of sexual abuse or pornography in the house, they recovered a handgun from a computer desk drawer, and two handguns from an armoire.  *See id.* at 380-82.

Investigator Kilmartin contacted the Air National Guard in Texas and learned that Petitioner planned to return to New York on December 15, 2006.  *See id.* at 354.  He and Investigator Gilston met Petitioner at the Albany International Airport and told him that they wanted to talk to him about the handguns in his home. *See id.* at 356, 358, 385.  Petitioner agreed to accompany them to the police station, and Investigator Gilston advised Petitioner of his *Miranda* rights while they were still in the airport.  *See id.* at 356-57.  Petitioner indicated, however, that he still wished to speak with the investigators.  *See id.*  While still at the airport, Petitioner informed Investigator Kilmartin that he had consumed two alcoholic beverages while on the plane.  *See id.* at 386.

They arrived at the Sheriff's Office at 6:00 p.m., and Investigator Kilmartin again advised Petitioner of his *Miranda* rights.  *See id.* at 358.  Thereafter, the investigators spoke to Petitioner about the allegations regarding his daughter and Petitioner ultimately admitted that he engaged in the alleged activities with is daughter.  *See id.* at 374-75.  Investigator Kilmartin finished transcribing Petitioner's written statement at 7:25 p.m.  *See id.*  After Petitioner read and signed his statement, the investigators signed it as well.  *See id.* at 365.  This statement was read into the record at trial.  *See id.* at 376-78.  In the statement, Petitioner admitted that, in the past two years, he allowed his daughter to "play" with his penis as many as five times and, on occasion, he

4

ejaculated.  *See id.*  Moreover, the statement indicates that Petitioner told D. not to tell anyone about their "game."  *See id.* at 378.

### 2. Petitioner's case

At trial, Petitioner testified on his own behalf.  Petitioner had previously served in the Navy and the reserves, and worked primarily as a truck driver.  *See id.* at 398-99.  In 2006, he transferred to the Air National Guard.  *See id.* at 398.  Petitioner and T. married eight years prior to trial.  *See id.* at 399.  Their marital problems began six-to-eight months after D. was born.  *See id.*  By November of 2006, they were discussing divorce.  *See id.* at 401.

In 2006, Petitioner obtained a power generation job, which required him to take a training course with the Air National Guard in Texas.  *See id.* at 402-05.  Petitioner left for Wichita Falls, Texas, on October 27 or 28, 2006 to attend the course.  *See id.* at 405.  Petitioner testified that he owned three handguns which he stored in a locked cabinet in his computer desk.  *See id.*

While in Texas, Petitioner called his family often.  *See id.* at 407.  After about a month and a half of training, in early December, when Petitioner tried to call his family, no one answered the telephone and the answering machine did not pick up his call.  *See id.* at 407-09.  After failing to reach T. or leave a message for her, a chief pulled him out of a training class and suggested that he return to New York to make sure that his family was safe.  *See id.* at 407-10.

On December 15, 2006, Petitioner boarded a 6:00 a.m. flight to Chicago.  *See id.* at 410.  Petitioner waited in Chicago for six or seven hours for his next flight to Albany.  *See id.* at 410-11.  While waiting in Chicago, Petitioner began to drink and eventually became so intoxicated at the first airport bar that he was "cut off" and had to move to another airport bar.  *See id.* at 411-12.  While on route to Albany, Petitioner consumed an additional two beers.  *See id.* at 412-13.

When Petitioner arrived in Albany, two investigators stopped him at the airport and asked to speak with him about illegal handguns recovered from his home. *See id.* at 413-14. Petitioner testified that he did not recall whether the investigators advised him of his *Miranda* rights at the airport, but he did recall that he was advised of his rights at the Sheriff's Office, most likely after the investigators informed him that they wanted to discuss the allegations of sexual abuse made against him. *See id.* at 417.

Petitioner told the investigators that D. told him and T. about the "belly bunker" game at some point in 2003, after the Hughes family had babysat D. *See id.* at 420. Petitioner told the investigators that D. had indicated that the "game" had "been going on for quite awhile," and that he and T. had decided to hire other babysitters. *See id.* at 422-23. It was at this point that Petitioner and T. hired Ms. Cromer and Mr. Wehr to babysit D. *See id.* at 423.

According to Petitioner, the investigators were not interested in this information and instead wanted Petitioner to give them a statement that was consistent with the statements they had received from T. and D. *See id.* Petitioner testified that he had the investigators read T.'s statement to him so that he could tell them "what [they] wanted me to tell them." *See id.* at 424. Petitioner claimed that the investigators told him that "maybe" he could go home if he told them what they wanted to hear. *See id.* at 425. During his interrogation, Petitioner claimed that he was "pretty heavily intoxicated," "very, very overtired," and "underneath heavy mental duress" because he was worried about his family. *See id.* at 421-22, 432.

Petitioner also testified that the investigators "coach[ed]" him on what to say in the statement regarding the allegations of sexual misconduct. *See id.* at 426, 437. Petitioner claimed that he signed the statement so that he could go home, but that he "didn't even really read it." *See*

*id.* at 427.  After Petitioner signed the statement, the investigators placed him under arrest.  *See id.*

Petitioner also testified that when D. was approximately two-years old, she "laid right down in front of [him] stark naked and did a womanly sexual act," and that T.'s sister had been babysitting D. when this occurred.  *See id.* at 428-29.  Petitioner claimed that D. told him that her cousin taught her the act.  *See id.* at 429.  Thereafter, Petitioner told T. about the incident, and T. said that she would try to take care of the matter.  *See id.*

**B.     Verdict and sentencing**

On September 12, 2007, the jury found Petitioner guilty of the sole count in the indictment, *i.e.*, Course of Sexual Conduct Against a Child in the Second Degree.  *See id.* at 542-45.  On November 27, 2007, the court sentenced Petitioner to a determinate prison term of six years, plus three years of post-release supervision.

**C.     Petitioner's appeal**

On March 5, 2009, the Appellate Division, Third Department unanimously affirmed Petitioner's conviction.  *See People v. Stewart*, 60 A.D.3d 1111 (3d Dep't 2009).  First, the court found that Petitioner's confession "clearly established the time frame of the events and that the sexual conduct occurred over the course of nearly two years," and that his confession was "sufficiently corroborated by the testimony of the child."  *Id.* at 1112.  Specifically, the court noted that the victim testified as follows:

> that she played the belly bunker game with her father from the time
> that she was three years old until he left the house, which other
> evidence established was when he went to Texas for air national
> guard training in October 2006.  Although the child initially

7

> testified that she played the belly bunker game 160 times, she later
> stated that it was 100 times, more than the number of fingers she
> could hold up.

*Id.*  The Appellate Division therefore held that "a rational juror could conclude that the sexual

conduct occurred for the necessary duration of time to satisfy the elements of the crime" of

Course of Sexual Conduct Against a Child in the Second Degree.  *Id.*

The Appellate Division also rejected Petitioner's claim that the evidence was insufficient

because his daughter could not properly identify him at trial.  *See id.* at 1113.  The court

explained that "[a]lthough the child, at some points during her testimony, expressed uncertainty

about whether her father was present in the courtroom, the child's mother testified that [Petitioner]

had gained weight and that his appearance had changed significantly since he had left for Texas

nearly a year earlier."  *Id.*  The court noted further that "the child indicated that her father was the

only person with whom she played the belly bunker game and she clearly identified him in the

courtroom at the conclusion of her testimony."  *Id.*  Therefore, the court concluded that the

evidence was legally sufficient to establish Petitioner had committed the crime.  *See id.*  The

Appellate Division also rejected Petitioner's argument that the verdict was against the weight of

the evidence.  *See id.*

Finally, the Appellate Division found Petitioner's claim that his sentence was harsh and

excessive to be meritless, despite Petitioner's lack of criminal history.  *See id.*  Moreover, the

court discerned no extraordinary circumstance warranting a reduction in sentence, "particularly in

view of the disturbing nature of [Petitioner's] actions in which he essentially robbed his young

daughter of her innocence."  *Id.* at 1113-14.

By letter dated April 6, 2009, Petitioner's counsel sought leave to appeal to the New York

State Court of Appeals.  *See* Exhibit "E."  Petitioner only requested that the court grant leave on

the legal sufficiency claim argued before the Appellate Division.  *See id.* at 1-2.  On May 21,

8

2009, the Court of Appeals denied Petitioner's application.  *See People v. Stewart*, 12 N.Y.3d 860 (2009).


**D.     The petition before the Court**

In his petition for a writ a *habeas corpus*, Petitioner raises three grounds for relief.  In his first two grounds, Petitioner argues that the evidence proving his guilt was legally insufficient and that the conviction was against the weight of the evidence.  *See* Dkt. No. 1 at ¶ 12(A)-(B). Petitioner argues that his daughter provided only "[v]ague testimony," who was three at the time of the alleged incident, and that her trial testimony two-years later is insufficient to support his conviction.  *See id.* at ¶ 12(A).  Moreover, Petitioner claims that there was no physical evidence, specific dates when the alleged incidents occurred, or any other first hand witnesses.  *See id.* Further, Petitioner argues that his statement given to the investigators, which corroborated the alleged conduct, was "given under questiona[ble] circumstances in which he was admittedly drunk, over-tired from a long day of airline travel, was worried about his family's well-being, and promises by investigators that he would be released if he admitted guilt."  *See id.*

As to his claim that his conviction was against the weight of the evidence, Petitioner claims that his explanation of the events "was at least as rational as those used by the prosecution."  *See id.* at ¶ 12(B).  Specifically, Petitioner argues that (1) his confession was obtained under questionable circumstances; (2) he denied any sexual conduct under oath and during cross-examination; (3) he raised the issue that the incident was likely perpetrated by a male neighbor; and (4) that marital problems caused his wife to be vindictive and led her to coach his daughter about this fabricated story.  *See id.*

Finally, Petitioner argues that, although his sentence was legally permissible, it was nevertheless unreasonable considering that this was his first felony offense, his status in the military and community, and his family status. *See id.* at ¶ 12(C).

## III. DISCUSSION

**A.    Exhaustion and procedural default[4]**

A petitioner in custody pursuant to a judgment of a state court is entitled to federal habeas relief only if he has exhausted all available state-court remedies. *See* 28 U.S.C. § 2254(b)-(c).  A claim has been exhausted if it was fairly presented in the state courts, thereby giving the state the "opportunity to pass upon and correct" alleged violations of federal rights. *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971)).  A petitioner need not have cited "'book and verse on the federal Constitution'" in his claim in state court for the claim to have been exhausted. *Picard*, 404 U.S. at 278 (quotation omitted).  Rather, a petitioner may have fairly presented his claim to the state courts through

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Daye v. Attorney Gen. of the State of N.Y.*, 696 F.2d 186, 194 (2d Cir. 1982).

As the Second Circuit has held, "'to invoke "one complete round of the State's established appellate review process" . . . , a criminal defendant must first appeal his or her conviction to the Appellate Division, and then must seek further review of that conviction by applying to the Court

---

[4] Respondent concedes, and the Court agrees, that the petition before the Court is timely. *See* Dkt. No. 12 at 16-17.

of Appeals for a certificate granting leave to appeal.'"  *Smith v. Duncan*, 411 F.3d 340, 345 (2d

Cir. 2005) (quoting *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005)) (internal quotation

omitted).  Applicants for leave to appeal must submit briefs and other documents to the Court of

Appeals, identifying the issues upon which the application is based, and must focus upon

identifying problems of reviewability and preservation of error.  *See id.* (quotations omitted).

      In *Smith v. Duncan*, the Court specifically stated that the New York Court of Appeals

would construe a petitioner's leave application as abandoning any claims that were presented to

the Appellate Division, but not included in the leave application.  *See id.* (quotation omitted).  In

*Grey v. Hoke*, the Second Circuit held that where a petitioner requested review by the New York

Court of Appeals of only one of three issues raised in the Appellate Division, the other two claims

were not presented for exhaustion purposes.  *See Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991).

The court found that it would undermine the principles of comity to consider a constitutional

claim as to which no ruling was requested from the state court.  *See id.* (citation omitted).

      If a petitioner has not exhausted his state court remedies, but no longer has remedies

available in state court with regard to these claims, they are "deemed" exhausted but are also

procedurally defaulted.  *See Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) (citations

omitted).  A state prisoner who has procedurally defaulted on a federal claim in state court is

entitled to federal habeas review of that claim only if he can show both cause for the default and

actual prejudice resulting from the alleged violation of federal law, or that failure of the court to

consider the claim will result in a miscarriage of justice.  *See Coleman v. Thompson*, 501 U.S.

722, 748-50 (1991).  A miscarriage of justice occurs if the constitutional violation has "probably

resulted in the conviction of one who is actually innocent."  *Murray v. Carrier*, 477 U.S. 478, 496

(1986).

In the present matter, Petitioner fully exhausted his legal sufficiency claim, but failed to exhaust his weight of the evidence and excessive sentence claims.  Petitioner raised all three of these claims in his direct appeal to the Appellate Division, Third Department.  *See People v. Stewart*, 60 A.D.3d 1111 (3d Dep't 2009).  In his application for leave to appeal to the New York State Court of Appeals, however, Petitioner only requested that the court grant leave as to his legal sufficiency claim.  *See* Exhibit "E."  Since Petitioner failed to raise his weight of the evidence and excessive sentence claims in the highest court available to him, those claims are unexhausted.  *See Smith*, 411 F.3d at 345.

Moreover, because Petitioner cannot return to state court, he has not only failed to exhaust his claims, but has also procedurally defaulted on them.  As such, the Court may address the merits of these claims only if Petitioner establishes cause for the default and prejudice, or that to allow the conviction to stand would constitute a fundamental miscarriage of justice.  *See Bossett*, 41 F.3d at 829 (citing *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S. Ct. 2497, 2506-07, 53 L. Ed. 2d 594 (1977)).  If a petitioner is not able to show cause for his procedural default, the court need not decide the issue of prejudice, because in order to qualify for habeas review under this exception, the petitioner must demonstrate both cause and prejudice.  *See Long v. Lord*, No. 03-CV-461, 2006 WL 1977435, *6 (N.D.N.Y. Mar. 21, 2006) (citing *Stepney*, 760 F.2d at 45) (footnote and other citations omitted).

In the present matter, Petitioner fails to establish cause for his procedural default, or prejudice resulting therefrom.  In fact, Petitioner does not even attempt to argue in either his petition or his traverse that there was cause for his procedural default or that he has suffered prejudice therefrom.  *See* Dkt. Nos. 1, 14.  Furthermore, he has not made a demonstration of "actual innocence" so as to convince the Court that a fundamental miscarriage of justice will

result if it declines to entertain his procedurally defaulted claims.  As such, the Court grants

Respondent's motion as to Petitioner's weight of the evidence and excessive sentence claims.  *See*

*Calderon v. Keane*, 115 Fed. Appx. 455, 458 (2d Cir. 2004) (finding claims procedurally

defaulted because the petitioner failed to raise them before the New York Court of Appeals and

he failed to argue cause and prejudice, or a fundamental miscarriage of justice to allow the court

to consider the merits of his claims).

Although the Court finds that Petitioner has procedurally defaulted on his weight of the

evidence and excessive sentence claims, the Court will still address the merits of each of

petitioner's claims.  *See Lucas v. Conway*, No. 08 Civ. 8405, 2009 WL 2525489, *5 (S.D.N.Y.

July 16, 2009) (holding that "the law is clear that a habeas court may deny a claim on the merits

despite a petitioner's failure to exhaust it fully before the state courts" (citing 28 U.S.C. §

2254(b)(2); *Rhines v. Weber*, 544 U.S. 269, 277 (2005)).


**B.      Standard of review**

The enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA") brought

about significant new limitations on the power of a federal court to grant habeas relief to a state

prisoner under 28 U.S.C. § 2254.  In discussing this deferential standard, the Second Circuit noted

in *Rodriguez v. Miller*, 439 F.3d 68 (2d Cir. 2006), *cert. granted, judgment vacated and cases*

*remanded on other grounds by* 549 U.S. 1163 (2007), that

> a federal court may award habeas corpus relief with respect to a
> claim adjudicated on the merits in state court only if the
> adjudication resulted in an outcome that: (1) was "contrary to, or
> involved an unreasonable application of, clearly established Federal
> law, as determined by the Supreme Court of the United States"; or
> (2) was "based on an unreasonable determination of the facts in
> light of the evidence presented in the State court proceeding."

*Id.* at 73 (quoting 28 U.S.C. § 2254(d)) (footnote omitted); *see also DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005) (quotation omitted); *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir. 2003) (quotation omitted).

In providing guidance concerning the application of this test, the Second Circuit has observed that

> a state court's decision is "contrary to" clearly established federal
> law if it contradicts Supreme Court precedent on the application of
> a legal rule, or addresses a set of facts "materially
> indistinguishable" from a Supreme Court decision but nevertheless
> comes to a different conclusion than the Court did.  [*Williams v.
> Taylor*, 529 U.S. 362] at 405-06, 120 S. Ct. 1495 [(2000)]; *Loliscio
> v. Goord*, 263 F.3d 178, 184 (2d Cir. 2001) . . . . [A] state court's
> decision is an "unreasonable application of" clearly established
> federal law if the state court "identifies the correct governing legal
> principle from [the Supreme] Court's decisions but unreasonably
> applies that principle to the facts" of the case before it.  *Williams*,
> 529 U.S. at 413, 120 S. Ct. 1495.

*Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007); *see also Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000)).

Significantly, a federal court engaged in habeas review is not charged with determining whether the state court's determination was merely incorrect or erroneous, but instead whether such determination was "objectively unreasonable."  *Williams v. Taylor*, 529 U.S. 362, 409 (2000); *see also Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001) (citation omitted).  Courts have interpreted "objectively unreasonable" in this context to mean that "'some increment of incorrectness beyond error'" is required for the habeas court to grant the application.  *Earley v. Murray*, 451 F.3d 71, 74 (2d Cir. 2006) (quotation omitted).

A state court determines a petitioner's federal claim "on the merits" and triggers the highly-deferential AEDPA standard of review when the state court "(1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment."  *Sellan*, 261 F.3d at 312 (quotation

omitted).  In this regard, it is not necessary for the state court to refer explicitly to the particular federal claim or to relevant federal case law.  *See id.*

If, however, a state court does not adjudicate a petitioner's federal claim "on the merits," the state-court's decision is not entitled to AEDPA deference; and, instead, the federal habeas court must apply the pre-AEDPA standard of *de novo* review to the state-court's disposition of the federal claim.  *See Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003) (quoting *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001)).

## C.     Legal sufficiency and weight of the evidence

Respondent argues that Petitioner is not entitled to relief because the Appellate Division's rejection of his legal sufficiency claim was not contrary to or an unreasonable application of clearly established federal law.  *See* Dkt. No. 12 at 23.  In support of his claim, Petitioner argues that there was no forensic evidence offered at trial and no psychological testing on D.  *See* Dkt. No. 14 at 9.  Petitioner admits that there was "compelling testimony that daughter 'D' was subjected to some type of sexual abuse[,]" but argues that the evidence "points equally as probable to sources other than [him]."  *See id.*  Moreover, Petitioner claims that D.'s testimony was influenced by her mother and that, on cross-examination, when D. was asked whether this incident "may not have happened[,]" she answered "[y]es."  *See id.* at 8-9 (quotation omitted).

Review of a conviction as against the "weight of the evidence" is a product of New York state statute and, therefore, merely a state-law issue.  *See* N.Y. Crim. Proc. Law § 470.15; *Ward v. Herbert*, 509 F. Supp. 2d 253, 264 & n.3 (W.D.N.Y. 2007) (citations omitted).  Since federal habeas corpus review is not available to remedy mere errors of state law, *see Estelle*, 502 U.S. at 67-69, no cognizable federal issue is presented by a habeas claim challenging the weight of the

evidence adduced at trial, *see Ward*, 509 F. Supp. 2d at 264 & n.3 (citations omitted).  As such, the Court denies the petition insofar as Petitioner argues that his conviction was against the weight of the evidence.

A challenge to the sufficiency of the evidence, however, is amenable to federal habeas review.  *See Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (citing *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)).  To analyze the sufficiency of the evidence of a state conviction, "'[a] federal court must look to state law to determine the elements of the crime.'"  *Id.* (quotation omitted).  A habeas petition claiming that the evidence was legally insufficient to support a state-court conviction fails if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  This standard places a "'heavy burden'" on a habeas petitioner since a habeas court is required to consider the trial evidence in the light most favorable to the prosecution.  *See United States v. Parkes*, 497 F.3d 220, 225 (2d Cir. 2007) (quotation and other citations omitted); *see also Jackson*, 443 U.S. at 319 (citation omitted).

Petitioner was charged and convicted of Course of Sexual Conduct Against a Child in the Second Degree, in violation of New York State Penal Law § 130.80.  "A person is guilty of course of sexual conduct against a child in the second degree when, over a period of time not less than three months in duration . . . he or she engages in two or more acts of sexual conduct with a child less than eleven years old[.]"  N.Y. Penal Law § 130.80(1)(a).  "Sexual conduct" is defined as "sexual intercourse, oral sexual conduct, anal sexual conduct, aggravated sexual contact, or sexual contact."  N.Y. Penal Law § 130.00(10).  "Sexual contact" is defined as "any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party.  It includes the touching of the actor by the victim, as well as the touching of the victim by

the actor, whether directly or through clothing, as well as the emission of ejaculate by the actor upon any part of the victim, clothed or unclothed." N.Y. Penal Law § 130.00(3).

As the Appellate Division correctly determined, Petitioner's conviction was not based on legally insufficient evidence. At trial, D. testified that she and Petitioner played the "belly bunker" game at least more than ten times. *See* Tr. at 311. In the statement provided to the investigators, Petitioner confessed that he had sexual contact with his daughter at least four times, and that the contact began about two years before December 2006 (the time when he gave his statement) and that the last sexual contact occurred in October 2006. *See id.* at 376-78. Therefore, Petitioner admitted that the alleged sexual contact occurred over a span of almost two years. *See id.* D. also testified that she and Petitioner played the "game" until the time when Petitioner left for training in Texas, *i.e.*, October of 2006. *See id.* at 305-06. Finally, D. testified that this "belly bunker" game consisted of Petitioner taking down his pants, that Petitioner had this "great big thing," that she touched it and it was "[a]ll hard," and that she got "some white stuff" on her shirt the second time this occurred. *See id.* at 304-05.

In his signed statement, which was read into the record at trial, Petitioner admitted to the following conduct:

> About two years ago, . . . [m]y daughter, [D.], asked me about my belly bunker. I wasn't exactly sure what she was talking about. I asked her what it was. She pointed to my penis and touched it. [D.] kept trying to touch it. So I got up and told her it was wrong. About three or four weeks later, the same thing happened again. [D.] wanted to play with my penis, so I let her pull my pants down. [D.] would stroke my penis. I let her do this for three or four minutes, until I got up and told her it was wrong. I did get an erection, but I did not ejaculate. Another three or four weeks later, I was sitting in a chair with [D.]. I was wearing shorts. And [D.] wanted to play with my penis. She pulled my shorts down, began masturbating my penis. [D.] played with it for about two or three minutes. I got an erection and began to ejaculate, but stopped, because I knew it was wrong. [D.] got sperm on her shirt. I told

> her to take off her shirt and put it in the dirty clothes.  The last time
> it occurred was October, of 2006.  [D.] and I went to the dump in
> Randall.  When we got back, [D.] asked me if we could play belly
> bunker.  That's what she called it when she played with my penis.
> We were both in the kitchen, by the washer.  [D.] grabbed my belt
> buckle and pulled it off.  I unzipped my pants and pulled my pants
> down.  My penis was almost hard, because I was excited about [D.]
> touching my penis.  I let [D.] play with it for a minute or two,
> before I stopped her.  I started to ejaculate, but stopped, because I
> knew what we were doing was wrong.

*See id.* at 377-78.

Taking the evidence and testimony presented at trial in the light most favorable to the

prosecution, it is clear that a rational trier of fact could conclude that Petitioner engaged in the

conduct underlying his conviction.  D.'s testimony and Petitioner's sworn admission clearly

establish each of the required elements of the crime Course of Sexual Conduct Against a Child in

the Second Degree.

Moreover, to the extent that Petitioner is arguing that D.'s testimony and his sworn

confession were unreliable because of inconsistencies presented, such arguments ask the Court to

make credibility determinations that are outside of the scope of habeas review.  Any claim by

Petitioner that a witness' testimony was unworthy of belief is not reviewable in *habeas*

proceedings since credibility determinations are the province of the jury.  *See Maldonado v.*

*Scully*, 86 F.3d 32, 35 (2d Cir. 1996) ("[A]ssessments of the weight of the evidence or the

credibility of witnesses are for the jury and not grounds for reversal on [habeas] appeal" (citation

omitted)).

Further, although Petitioner attacks the reliability and voluntariness of his signed

confession to the police investigators, the trial court conducted a *Huntley* hearing and found that

Petitioner voluntarily gave the confession and that, "while there was some testimony that

[Petitioner] had been drinking earlier that day, the [Petitioner] was not intoxicated at any point

during the encounter." *See* Exhibit "C" at RA 41.  Nothing in the record supports the implication that Petitioner was coerced into confessing or that, even though he had been drinking, his confession was not knowingly and voluntarily made.  *See Bruno v. Cunningham*, No. 03 Civ. 937, 2004 WL 2290503, *10 (S.D.N.Y. Oct. 8, 2004) (holding that evidence of a criminal defendant's intoxication with alcohol does not render a statement involuntary where law enforcement officer testified that the defendant was clear and coherent when the confession was made) (citing cases); *see also United States v. Wyche*, 307 F. Supp. 2d 453, 463 (E.D.N.Y. 2004) (holding that "[a] statement may still be voluntarily given even when the speaker is intoxicated or under the influence of drugs, as there is no *per se* rule that a confession given under such circumstances is involuntary" (citation omitted)).  A review of the hearing testimony makes clear that the trial court's decision was not an unreasonable application of the facts in light of the evidence presented or contrary to, or an unreasonable application of, clearly established Federal law.

Finally, to the extent that Petitioner argues that D.'s testimony was insufficient to support his conviction, other courts have found that, even without corroborating evidence, the testimony of a child victim is sufficient to support a conviction beyond a reasonable doubt.  *See Howard v. Potter*, No. 9:06-CV-0982, 2009 WL 3259080, *6 (N.D.N.Y. Oct. 7, 2009) (citations omitted); *see also Roe v. Senkowski*, No. 9:98–CV–0656, 2001 WL 1860884, *2–4 (N.D.N.Y. Feb. 20, 2001) (finding that testimony of a child victim, standing alone, was sufficient to support a conviction); *Arhin v. New York*, No. 94 Civ. 6921, 1995 WL 672488, *1 (S.D.N.Y. Nov. 9, 1995) (finding that no corroborating evidence was required to support a conviction of rape by forcible compulsion).  Although Petitioner seems to argue that D.'s testimony was the only direct evidence presented against him, as discussed above, that was clearly not the case.

Based on the foregoing, the Court finds that the Appellate Division's determination that Petitioner's conviction was legally sufficient was not contrary to or an unreasonable application of clearly established federal law, and it was not based on an unreasonable determination of the facts in light of the evidence presented.

**D.     Excessive sentence**

Petitioner was sentenced to a six-year prison term, to be followed by three-years post-release supervision.  Course of Sexual Conduct Against a Child in the Second Degree is a class D felony.  *See* N.Y. Penal Law § 130.80.  The sentencing range for a class D felony is between two and seven years.  *See* N.Y. Penal Law § 70.02(1)(c), (3)(c).  Petitioner claims that his sentence was overly harsh and excessive in light his military service, community status, and because this was his first offense.  *See* Dkt. No. 1 at ¶ 12(C).

It is firmly established that "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."  *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (citation omitted); *Mayerhofer v. Bennett*, No. 02-CV-0074, 2007 WL 1624767, *7 (N.D.N.Y. Jun. 6, 2007).  As such, Plaintiff's claim is not cognizable on federal habeas review. *See id.*  To the extent that Petitioner's claim could be viewed as a challenge under the Eighth Amendment's prohibition of cruel and unusual punishment, the claim must also fail.  The Eighth Amendment forbids only extreme sentences which are "grossly disproportionate" to the crime of conviction.  *See Lockyer v. Andrade,* 538 U.S. 63, 72-73 (2003) (citation omitted); *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (citation omitted).  It is well-established that a sentence of imprisonment that is within the limits of a valid state statute is not cruel and unusual punishment in the constitutional sense.  *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (citation

omitted); *Lou v. Mantello*, No. 98-CV-5542, 2001 WL 1152817, *13 (E.D.N.Y. Sept. 25, 2001) (citation omitted).

Based on the foregoing, the Court finds that Petitioner's claim that his sentence was excessive is not cognizable on federal habeas review; and, therefore, the Court denies the petition as to this claim.

**E.      Certificate of Appealability**

The Court notes that 28 U.S.C. § 2253(c)(1) provides, in relevant part, that, "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from – (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court[.]"[5]  28 U.S.C. § 2553(c)(1).  A court may only issue a Certificate of Appealability "if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

Since Petitioner has failed to make such a showing with regard to any of his claims, the Court declines to issue a Certificate of Appealability in this matter.  *See Hohn v. United States*, 524 U.S. 236, 239-40 (1998) (quotation omitted).  Further, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and, therefore, *in forma pauperis* status is denied for the purpose of an appeal.  *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

**IV. CONCLUSION**

---

[5] Rule 22 of the Federal Rules of Appellate Procedure also provides that an appeal may not proceed in such actions "unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."  Fed. R. App. P. 22(b)(1).

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Petitioner's petition for a writ of habeas corpus is **DENIED** and **DISMISSED**; and the Court further

**ORDERS** that no Certificate of Appealability shall be issued with respect to any of Petitioner's claims; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Respondent's favor and close this case.

**IT IS SO ORDERED.**

Dated: September 19, 2012
        Albany, New York

Mae A. D'Agostino
U.S. District Judge

22